NO. 12-01-00009-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


EXXON CORPORATION,
§
 APPEAL FROM THE FOURTH

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


DAVID PLUFF,

APPELLEE
§
 RUSK COUNTY, TEXAS

 

 A jury awarded David Pluff $30,000 as damages for Exxon Corporation's failure to remove
abandoned oilfield materials from ten acres of land located in Rusk County, Texas. In seventeen
issues, Exxon appeals the jury's verdict. We reverse and render.


Background


 On November 13, 1930, M. and Rade Kangerga executed an oil, gas and mineral lease ("the
lease") to Exxon Corporation ("Exxon"), then known as Humble Oil & Refining Company, covering
331 acres of land located in Rusk County, Texas. During the 1930s, Exxon drilled three or four oil
wells on ten acres of land that was a part of the acreage described in the lease. David Pluff ("Pluff")
presently owns the ten acres ("the property") on which the wells were located.

 Exxon drilled the wells on the property prior to the advent of portable drilling equipment. 
As a result, a permanent rig structure known as a standard derrick was used to drill each well. Each
derrick had four legs, and each leg was anchored by a derrick corner that was constructed from
concrete poured below the surface from four to six feet deep. (1) In addition to the derricks and
concrete derrick corners, Exxon placed other structures and materials on the property that were used
in producing the wells, including drilling equipment, tanks, concrete pumping unit pads, and pipes
of varying sizes.

 Prior to 1984, the oil wells on the property ceased to produce. Exxon removed all of the
derricks, drilling equipment, and tanks from the property, but left some of the concrete structures,
pipes, and other materials. Exxon then plugged and abandoned the wells and conducted no further
operations of any kind on the property after 1984. (2) 

 Effective June 1, 1984, Exxon assigned certain deep rights in the lease to Gene Powell
Investments, Inc. ("Powell"). Powell drilled and later plugged a gas well on the property, but Exxon
had no involvement in Powell's operations. In December 1991, Exxon assigned its rights from the
surface of the property to the base of the Woodbine formation to Maxwell Oil and Gas Corporation
("Maxwell"). The wells Exxon drilled on the property produced from the Woodbine formation. 
Thus, after the assignment to Maxwell, Exxon had no interest in the abandoned oil wells, their
wellbores, the formation from which the wells produced, or any "personal property, wells, facilities,
fixtures, or equipment" situated upon the property. 

 On June 12, 1992, Pluff purchased the property for $10,000, which is $1,000 an acre, but
acquired no interest in the mineral estate. At the time of Pluff's purchase, the abandoned oilfield
materials were on the property, along with a variety of discarded items such as old car parts and
appliances that had been dumped by unknown persons. During the first year after his purchase, Pluff
moved two cows and some horses onto the property for a short time. However, he soon moved them
to another tract because the debris on the property rendered it unsuitable for livestock. The debris
also prevented Pluff from using his tractor on the property. Ultimately, Pluff concluded that he could
do nothing with the property unless the oilfield materials and other debris were removed. 

 On March 6, 1995, Pluff sued Relico Oil & Gas, the current operator of the lease, and its
partners, Dean Carter and Milton Allen. In his original petition, Pluff alleged that the defendants
conducted oil and gas operations on the property and "us[ed] more of the surface that [sic] is
reasonably necessary or have been negligent in the operations causing damage to the surface" of the
property. Pluff further alleged that the actions of the defendants were "in violation of the common
law and lease covenants contained in the original lease" and sought actual and punitive damages for
actions he characterized as "deliberate, willful, and malicious." On August 28, 1997, Pluff filed his
first amended petition, naming Powell, Maxwell, and Exxon as additional defendants. 

 The case was called for trial on January 9, 2001. (3) Kenneth Frasier ("Frasier"), a petroleum
consultant, testified about the inspection of the property that he conducted at Pluff's request. During
his testimony, Frasier identified photographs depicting various oilfield materials located on the
property, including concrete derrick corners, concrete pumping unit bases, and miscellaneous pieces
of pipe and concrete. He also testified that he found "a considerable amount of residual oil and some
evidence of salt water damage" as well as "a considerable amount of erosion," all of which were
caused by the lease operations. According to his estimate, the cost to remove the oilfield materials
and restore the property would be about $36,000. 

 Pluff testified that his claim against Exxon was based on its failure to remove all of the
oilfield materials that were used in the drilling and operation of the oil wells on the property. 
According to Pluff, all of the materials that were the subject of his complaint were on the property
before he bought it in 1992. He also testified that (1) Exxon had not conducted any operations on
the property since he purchased it, (2) he did not know whether anyone from Exxon had entered the
property since the date of his purchase, and (3) no oil spills occurred after the date he purchased the
property. 

 The trial court ruled that Exxon had a duty to remove the oilfield materials from the property.
One of the jury issues asked whether Exxon "fail[ed] to remove items it placed on the Land while
exploring for and/or producing oil and/or gas on the Land and to clean up the Land after it stopped
exploring for and/or producing oil on the Land." The jury answered in the affirmative and awarded
Pluff $30,000 as damages. The trial court entered judgment against Exxon in that amount, (4) and this
appeal followed. 

 In seventeen issues, Exxon asserts that (1) Pluff has no standing to assert a tort cause of
action against Exxon, (2) Exxon has no tort or contractual duty to remove the oilfield materials, (3)
Pluff's claims are barred by limitations, and (4) the evidence is legally insufficient to support the
judgment. Because standing is a threshold question, we address that issue at the outset. Douglas
v. Delp, 987 S.W.2d 879, 883 (Tex. 1999).


 Standing


 In its first issue, Exxon contends that Pluff lacked standing to assert a cause of action in tort
for injury to the property. Standing is a necessary component of subject matter jurisdiction. Texas
Ass'n of Bus. v. Air Control Bd., 852 S.W.2d 440, 445-46 (Tex. 1993). Subject matter jurisdiction
is essential to the authority of a court to decide a case. Id. Whether a trial court has subject-matter
jurisdiction is a question of law subject to de novo review. See Mayhew v. Town of Sunnyvale, 964
S.W.2d 922, 928 (Tex. 1998). Accordingly, we conduct a de novo review of a trial court's
determination of standing. Id.

 In considering the merits of Exxon's standing challenge, we apply the fundamental rule of
law that only the person whose primary legal right has been breached may seek redress for an injury. 
Nobles v. Marcus, 533 S.W.2d 923, 927 (Tex. 1976). In other words, a person has standing to sue
when he is personally aggrieved by the alleged wrong. Nootsie Ltd. v. Williamson County
Appraisal Dist., 925 S.W.2d 659, 661 (Tex. 1996). Without a breach of a legal right belonging to
a plaintiff, that plaintiff has no standing to litigate. Brunson v. Woolsey, 63 S.W.3d 583, 587 (Tex.
App.--Fort Worth 2001, no pet.). Therefore, to affirm the trial court's ruling that Pluff had standing,
we must determine that Pluff had a cause of action for injury to the property. Nobles, 533 S.W.2d
at 927 (citing American Nat'l Ins. Co. v. Hicks, 35 S.W.2d 128 (Tex. Comm'n App. 1931, judgm't
adopted)). 

 A cause of action accrues when a plaintiff first becomes entitled to file a lawsuit based upon
a legal wrong attributed to a defendant. Zidell v. Bird, 692 S.W.2d 554 (Tex. App.-Austin 1985,
no writ). Generally, a cause of action for injury to real property accrues when the injury is
committed. Bayouth v. Lion Oil Co., 671 S.W.2d 867, 868 (Tex. 1984) (cause of action for
permanent injury to land accrues upon discovery of first actionable injury); see Yancy v. City of
Tyler, 836 S.W.2d 337, 341 (Tex. App.-Tyler 1992, writ denied) (cause of action for temporary
injury to land accrues upon each actionable injury). The right to sue for the injury is a personal right
that belongs to the person who owns the property at the time of the injury. Abbott v. City of
Princeton, 721 S.W.2d 872, 875 (Tex. App.-Dallas 1986, writ ref'd n.r.e.); Lay v. Aetna Ins. Co,
599 S.W.2d 684, 686 (Tex. App.-Austin 1980, writ ref'd n.r.e.). Therefore, without express
provision, the right does not pass to a subsequent purchaser of the property. Abbott, 721 S.W.2d at
875; Lay, 599 S.W.2d at 686. Consequently, a mere subsequent purchaser cannot recover for an
injury committed before his purchase. Lay, 599 S.W.2d at 686. 

 Relying on the above rules, Exxon concludes that Pluff lacked standing because he did not
own the property at the time the injury occurred and did not obtain an assignment of any cause of
action that could have been asserted by his predecessors in title. As additional support for its
position, Exxon calls our attention to Senn v. Texaco, 55 S.W.3d 222 (Tex. App.-Eastland 2001,
pet. denied). 

 In the Senn case, Wilford C. and Wanda Joan Senn sued Texaco and others for damages
resulting from injury to their land. Specifically, the Senns contended that the defendants' drilling
and production activities caused permanent and temporary injury by contaminating the aquifer
underlying the land. The defendants filed a motion for summary judgment, contending that the
Senns lacked standing to assert a cause of action for permanent injury to the land because they
acquired the land after all drilling and production activities had ceased. The trial court agreed and
granted summary judgment. In affirming the trial court's ruling, the Eastland Court of Appeals
applied the rules discussed above relating to the accrual and ownership of a cause of action for injury
to real property. As a result, the court held that the Senns did not have standing because the injuries
occurred before they acquired the land and they did not obtain an assignment of any cause of action
belonging to their predecessors in title. Id. at 226.

 In the case at bar, it is undisputed that Exxon's drilling and production activities on the
property ceased prior to Pluff's purchase in 1992. It is also undisputed that all of the oilfield
materials were on the property on the date of Pluff's purchase. Further, the deed conveying the
property to Pluff does not purport to assign any cause of action that Pluff's predecessors in title could
have asserted. In spite of these factual similarities to Senn, however, Pluff disagrees that Senn is
applicable. 

 In an attempt to distinguish Senn from the present case, Pluff first contends that the language
in which the court disregards the distinction between permanent and temporary injury to land is dicta
because "[t]here was apparently no evidence to contradict Texaco's position that the aquifer was
permanently damaged." Although Pluff does not explain his argument, he appears to contend that
the trial court's determination that the Senns lacked standing turned on the characterization of the
injury and that the court of appeals agreed, at least implicitly, that the injury should be characterized
prior to any consideration of standing. However, that argument is clearly contrary to the holding in
Senn.

 The court in Senn recognized, as we do here, that standing is a threshold issue and that only
a person who has been aggrieved has standing to come into court. See id. Therefore, the proper
initial inquiry was whether the Senns had "a cause of action, which involves the combination of a
right on the part of the plaintiff and a violation of such right by defendant." Nobles, 533 S.W.2d at
927 (citing American Nat'l Ins. Co. v. Hicks, 35 S.W.2d 128 (Tex. Comm'n App. 1931, judgm't
adopted)). In making its inquiry, the court determined that the Senns had no cause of action, and
therefore lacked standing, because they showed no injury that occurred during their ownership of the
land. Senn, 55 S.W.3d at 226. The court clearly held that in determining standing, the
characterization of the injury was not important; it was the fact of injury that was critical. Id.

 The undisputed evidence in Senn, as here, showed a continuing condition that already existed
on the date of purchase. Without a new injury that occurred after they purchased the property or an
assignment of a cause of action for the prior injury, the Senns had not been aggrieved and therefore
had no standing. 

 Pluff also points out that although the sale in Senn was clearly "as is," his deed included "all
and singular the rights and appurtenances thereto in anywise belonging. . . ." That language, his
argument continues, is sufficient to transfer any cause of action owned by his grantors. We first note
that Pluff cites no authority for his interpretation of the quoted language in the deed. However, even
if we assume that Pluff's interpretation is correct, no evidence was introduced at trial to establish that
the injury occurred during the time Pluff's grantors owned the property. Consequently, we cannot
determine from the record whether Pluff's grantors ever owned the tort cause of action Pluff
asserted. To recover on an assigned cause of action, the party claiming the assigned rights must
prove that the cause of action was in fact assigned. Texas Farmers Ins. Co. v. Gerdes, 880 S.W.2d
215, 217 (Tex. App.-Fort Worth 1994, writ denied). Pluff did not make that showing.

 Based on our review of the record, we conclude that Senn is indistinguishable from the case
before us. Because the injury to the property occurred prior to Pluff's purchase and Pluff's deed
contains no assignment of any cause of action, we further conclude that Pluff lacked standing to
assert a tort cause of action against Exxon for injury to the property.


 Duty to Restore the Property


 In its second issue, Exxon contends that it has no contractual duty under the lease to remove
the oilfield materials from the property. Pluff reaches a contrary conclusion and argues that because
Exxon has the express right to remove oilfield materials on the expiration of the lease, it has an
implied obligation to do so. We disagree.

 Paragraph six of the lease provides that "[Exxon] shall have the right at any time during or
after the expiration of this lease to remove all property and fixtures placed by [Exxon] on said land
including the right to draw and remove all casing." Whether paragraph six imposes a duty upon
Exxon to remove the oilfield materials from the property is a question of law, and we review
questions of law de novo. Smithkline Beecham Corp. v. Doe, 903 S.W.2d 347, 351 (Tex. 1995);
El Paso Natural Gas Co. v. Minco Oil & Gas, 8 S.W.3d 309, 312 (Tex. 1999). The rights and
duties of the lessor and lessee are determined by the lease and are contractual. Amoco Prod. Co. v.
Alexander, 622 S.W.2d 563, 571 (Tex. 1981). However, we recognize that a duty can be either
express or implied. See, e.g., Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith, 145
Tex. 399, 409, 198 S.W.2d 729, 735 (1947). Therefore, we first determine whether the right to
remove in paragraph six creates an express duty for Exxon to remove the oilfield materials from the
property.

 In Lone Star Steel Co. v. Reeder, 407 S.W.2d 28 (Tex. Civ. App.--Texarkana 1966, writ
ref'd n.r.e.), the plaintiff and the defendant entered into leases for mining iron ore on the plaintiff's
land. After the leases terminated, the plaintiff sued the defendant for surface damages. Each lease
stated that "upon termination of the lease, Lessee shall have ninety (90) days to remove its
machinery, structures and other property erected on the land by Lessee." Id. at 29. In construing that
provision, the court held that "[i]t is clear that [the defendant] had no duty under such leases to take
any action to remove irregularities in the surface of plaintiff's land when mining was completed. . . ." 
Id. at 31. Although the lease in Reeder covered iron ore instead of oil and gas, we perceive no
significant difference in the substance of the quoted provision in the Reeder lease and paragraph six
of the lease in the case at bar. Therefore, we conclude that the language of paragraph six does not
impose an express duty for Exxon to remove the oilfield materials from the property and turn to the
question of implied duty. 

 Exxon contends that paragraph six of the lease does not create an implied duty to remove the
oilfield materials and cites Warren Petroleum v. Monzingo, 157 Tex. 479, 304 S.W.2d 362 (Tex.
1957). In Monzingo, the Texas Supreme Court considered whether a lessee has an implied duty to
restore the surface of the land after the cessation of drilling operations. The defendant ceased its
operations and abandoned the land, leaving slush pits unfilled and the land restored to its condition
before the oil operations. The jury found that the defendant's failure to restore the land constituted
negligence and proximately caused damages to the plaintiff. The supreme court reversed and
rendered judgment against the plaintiff.

 In reversing the judgment of the lower court, the supreme court held that "[i]f there was an
obligation resting upon the lessee to restore the surface either expressed by some provision in the
lease or by necessary implication, negligence would be an unnecessary averment because negligence
would not be essential to recovery. The action would be one in contract and not in tort. Admittedly
the lease contained no such provision and one is not to be read into the contract by implication." Id.,
157 Tex. at 481, 304 S.W.2d at 363. The court rejected any "implied duty to repair the damage done
to the land caused by rightful and necessary use." Id., 157 Tex. at 482, 304 S.W.2d at 363.

 In response to Exxon's argument, Pluff states that "the express right to remove equipment
on the expiration of an oil and gas lease negates any implication that the equipment is to remain and
to become a part of the property." As authority for his contention, Pluff cites Cox v. Rhodes, 233
S.W.2d 924 (Tex. Civ. App.-El Paso 1950, writ ref'd n.r.e.), in which the court considered a
provision that contained essentially the same language as paragraph six quoted above. However, the
issue before the court in Cox was quite different from the issue that we address here. 

 In Cox, the issue was whether a release of an oil and gas lease had the effect of passing title
to the casing in a well that had ceased to produce several months prior to the execution of the release. 
The trial court ruled that the release operated as a transfer of title to the casing. However, the
appellate court held that the lease provision that created the right to draw and remove the casing
"negatives any contract, express or implied, that such casing should become a permanent fixture and
part of the soil." Id. at 928. The court made no reference to any implied duty to remove the casing,
but held that the evidence raised an issue of fact as to whether the appellants had forfeited their title
to the casing by failure to remove it within a reasonable time. Id. Thus, Pluff's reliance on Cox is
misplaced. Further, the court's conclusion that a fact issue existed concerning whether the owners
had forfeited their title to the casing by inaction is inconsistent with any assertion that Cox is
authority for the proposition that a right to remove oilfield materials necessarily imposes a duty to
do so.

 Pluff further contends that an implied duty to remove the oilfield materials was imposed as
"a custom or usage of the industry." Custom and usage is a question of fact. Drilling Well Control,
Inc. v. Smith Indus., Inc., 459 S.W.2d 462, 465 (Tex. Civ. App.-Houston 1970, writ ref'd n.r.e.). 
In reviewing the record, we do not find that Pluff requested an issue on custom and usage or that he
presented any evidence concerning the custom and usage at the time the lease was executed. 
Therefore, the issue was waived, and Pluff cannot rely on custom and usage to establish any implied
duty for Exxon to remove the oilfield materials. Tex. R. Civ. P. 279.

 In considering whether Exxon had an implied duty to remove the oilfield materials, we have
conducted an extensive review of the relevant case law and find no authority that is contrary to the
Texas Supreme Court's holding in Monzingo. Therefore, we conclude that paragraph six of the
lease did not create an implied duty for Exxon to remove the oilfield materials from the property. 
 Having found that Exxon had neither an express nor an implied duty to remove the oilfield materials
from the property, we sustain Exxon's second issue. Because Exxon's first and second issues are
dispositive, we need not consider the remaining issues raised by Exxon. Tex. R. App. P. 47.1.

Conclusion


 Based upon the jury's verdict, the trial court entered judgment against Exxon for $30,000. 
Because we find that Pluff had no standing to assert a tort action and because we further conclude
that Exxon had no contractual duty to remove the oilfield materials from the property, we reverse
the judgment of the trial court and render judgment that Pluff take nothing against Exxon.




 SAM GRIFFITH 

 Justice



Opinion delivered May 31, 2002.

Panel consisted of Worthen, J., and Griffith, J.





 
















(PUBLISH)
1. At trial, all witnesses agreed that given the technology at the time, it was reasonable, customary, and necessary
for an oil operator to use concrete derrick corners for standard derricks.
2. The record does not include the specific dates on which the wells were plugged and abandoned.
3. At the time of trial, Pluff's live pleading was his fourth amended petition. Maxwell and Exxon were the only
defendants remaining in the lawsuit. Pluff did not proceed with his claims against Maxwell.
4. The eighteen issues submitted to the jury related to several theories of liability, including failure to remove
the oilfield materials and clean up the property, negligence, excessive use of land, trespass, and nuisance. Although the
jury answered all issues on liability favorably to Pluff, it found zero damages on all theories except Exxon's failure to
remove the oilfield materials and clean up the property.