

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-24-00302-CV

THE STATE OF TEXAS, JERRY PATTERSON, AS COMMISSIONER OF THE
GENERAL LAND OFFICE OF THE STATE OF TEXAS, AND COMMISSIONER
GEORGE P. BUSH, APPELLANTS/CROSSAPPELLEES

V.

JIMMY GLEN RIEMER, RICHARD COON, JR., JUNE MEETZE COON TRUST, HAP
JOHNSON ROYALTY CO., LLC, W.R. EDWARDS, JR. D/B/A W.R. EDWARDS, JR. OIL
AND GAS, BILLY PAUL RIEMER, SCHARRON ANN RIEMER, JIMMY GREENE,
TRUSTEE, RANDALL BLACK, JOAN B. VERNON, LINDA LAMAR, THERESA GAIL
ELLIOTT, KATHERINE SANDERS, CATHRYN COON DOUGHTIE, LONITA DAWN
JAMES, DEBORAH LYNN SCHUMANN, SHERRY ANN THOMPSON, JAMES DEAN
GREENE, CARLA SUE PUENTES, AND WANDA EAKIN,
APPELLEES/CROSSAPPELLANTS

On Appeal from the 84th District Court, Hutchinson County, Texas
Trial Court No. 30,441-B, Honorable Curt W. Brancheau, Presiding

June 25, 2025

OPINION

Before QUINN, C.J., and DOSS and YARBROUGH, JJ.

When the Sanford Dam's floodgates closed in 1965 to create Lake Meredith, it altered more than just the flow of the Canadian River.  It set in motion a three-decade dispute over who owns valuable mineral rights along a six-mile stretch of riverbed.

In this case, riparian landowners sued the State of Texas, alleging it unconstitutionally took their oil and gas interests without compensation. The trial court agreed and awarded the Landowners money damages. Both sides now appeal. Because we conclude the Landowners' claims were barred by the statute of limitations as a matter of law, we reverse the judgment and render judgment that the Landowners take nothing. We dismiss as moot the Landowners cross-appeal challenging the measure and amount of damages.

## BACKGROUND

The Canadian River flows from Colorado's Sangre de Cristo Mountains through New Mexico before entering the Texas Panhandle. Texas owns the riverbeds and minerals beneath them. *Riemer v. State*, 392 S.W.3d 635, 637–38 (Tex. 2013) (citing TEX. PARKS & WILD. CODE § 1.011(c); TEX. NAT. RES. CODE § 11.041(a)(1)). Beginning in 1937, J.M. Huber Corporation leased portions of the Canadian riverbed from the State, drilling oil and gas wells on what was considered public land. These ten-year leases were consistently renewed for decades, with Huber establishing numerous productive wells along the riverbed.

The literal and figurative landscape changed in 1965 when the Sanford Dam impounded the Canadian River, significantly reducing downstream flow through the six-mile stretch that is at issue in this case. This reduction exposed previously-submerged land—what the parties refer to as "reliction."[1] According to the Landowners, as the water receded, the riverbed (and the State's ownership interests) contracted to the river's

---

[1] "Reliction is the uncovering of previously submerged land by a permanent recession of a body of water . . . ." *State v. Brainard,* 12 S.W.3d 6, 17 (Tex. 1999)*, disapproved on other grounds, Martin v. Amerman,* 133 S.W.3d 262, 268 (Tex. 2004).

centerline, transforming the newly-exposed areas into private property. Yet the State continued renewing its leases with Huber, which operated twenty-one oil and gas wells in the area prior to 1982.[2] In the Landowners' view, this meant the State took valuable minerals from the Landowners' land without compensation.

This uncertainty of who owned what along the Canadian River also troubled state legislators, who passed a concurrent house resolution calling for the General Land Office to work with others "to identify and mark the boundaries of the Canadian River in the Panhandle of Texas."[3] A state-ordered survey never occurred. Rather, in the early 1980s, Huber commissioned[4] surveyor D.D. Shine to resurvey the disputed portion of the river.

On January 28, 1982, Shine filed his land survey, which the General Land Office adopted. The survey identified the gradient boundary[5] of the Canadian by locating the last natural riverbed before the Sanford Dam's completion, not its reduced state after the

---

[2] Landowners contend Huber aggressively drilled more leases and increased production after the Shine survey was completed. *See infra.*

[3] Tex. H.C.R. 33, 64th Leg., R.S., 1975 Tex. Gen. & Spec. Laws 3030 (observing that because of the river's uncertain boundaries, "the rights of private landowners, hunters and fishermen, and the State of Texas concerning the proper use of the river and its adjoining land cannot be adequately protected.").

[4] According to the Landowners, the State used Huber to establish a favorable boundary because officials knew the General Land Office would be legally bound if the Attorney General made an adverse boundary determination.

[5] The gradient boundary method originates from *Oklahoma v. Texas*, 260 U.S. 606, 631–32 (1923), and was adopted by the Texas Supreme Court in *Motl v. Boyd*, 116 Tex. 82, 286 S.W. 458, 467 (1926). It is "located midway between the lower level of the flowing water that just reaches the cut bank and the higher level of it that just does not overtop the cut bank," representing "the mid-height point of the lowest 'acceptable' or qualified bank in the vicinity." Arthur A. Stiles and Graham B. Smedley, *The Gradient Boundary-The Line Between Texas and Oklahoma Along the Red River,* 30 TEX. L. REV. 305 (1952). When properly marked, "the land between the gradient boundary lines constitutes the river's bed." *Brainard*, 12 S.W.3d at 16.

dam. Shine followed a 1971 Texas Attorney General's Opinion stating that dam construction does not alter the State's riverbed ownership.[6]

The Landowners contend the Shine Survey fundamentally misrepresented the gradient boundary and the extent of the State's ownership interests. The Landowners and trial court identify January 28, 1982—the date Shine submitted the survey—as the moment defining when the State began taking Landowners' mineral interests without compensation.

Litigation ensued in 1993 when the State sued Hugo Riemer for surface trespass after he erected fencing blocking Huber's access to production wells.[7] The timeline of the Landowners' takings claims emerged much later, with Jimmy Glen Riemer first suing for a constitutional takings claim sometime between October 1999 and April 2000.[8] The remaining plaintiffs joined in later.

The trial court issued several key rulings. In August 2008, it declared the Shine Survey invalid. Via a summary judgment order in May 2017, it rejected the State's limitations defense, finding a 25-year limitations period applied as a matter of law. It also declared the Canadian River non-navigable in the disputed area.

---

[6] *See State v. Sims*, 871 S.W.2d 259, 260 (Tex. App.—Amarillo 1994, no writ).

[7] Hugo Riemer passed away in 1999. Prior to April 24, 2000, the Landowners' claims were limited to trespass and conversion; no constitutional takings claims had been alleged. The State nonsuited its claims against Hugo in July 2000.

[8] The record conflicts regarding when Jimmy Riemer first brought a takings claim. However, it is unnecessary to pinpoint the date because both periods are well outside the applicable limitations period.

The remaining claims proceeded to a bench trial. On February 12, 2024, the court rendered final judgment for the Landowners, finding the State liable and awarding $531,231.36 in damages to some Landowners.[9] Both sides appealed.

**ANALYSIS**

A. Do the Landowners Possess Standing?

We begin with the State's challenges to the Landowners' standing because this determination is essential to our power to decide the case. *McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 912–13 (Tex. 2023). Courts must establish jurisdiction before addressing the merits, as they lack judicial power to decide cases without jurisdictional authority. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 95 (Tex. 2012); *Tex. Right to Life v. Van Stean*, 702 S.W.3d 348, 355 (Tex. 2024) (per curiam).

1. Constitutional vs. Prudential Standing

Constitutional standing to bring suit is a fundamental component of subject matter jurisdiction. *Van Stean*, 702 S.W.3d at 354. It requires three elements: (1) a concrete, particularized,[10] actual or imminent injury (2) traceable to the defendant's conduct and (3) redressable by a favorable decision. *Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 440 (Tex. 2023). This is a question of law. *Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 150–51 (Tex. 2012).

---

[9] When including interest during the pendency of the case, the amount awarded to Landowners exceeds $1.2 million.

[10] An injury is "particularized" for standing purposes if it "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, n.1 (1992)).

5

Constitutional standing differs from "prudential standing," which asks whether a particular plaintiff should be permitted to bring a particular claim. *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 774 (Tex. 2020). Prudential standing does not affect jurisdiction, though it might affect whether a plaintiff can prevail on the merits. This distinction matters. For constitutional standing deficiencies, courts must dismiss for want of jurisdiction without reaching the merits. When there are prudential standing deficiencies, courts retain jurisdiction but may deny relief based on the plaintiff's lack of authority to pursue the claim. *Van Stean*, 702 S.W.3d at 354; *Pike*, 610 S.W.3d at 774.

The U.S. Supreme Court identified three general examples of instances in which litigants and courts use the label "standing" when really addressing the merits:

- the general prohibition on a litigant's raising another person's legal rights,

- the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and

- the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 134 S. Ct. 1377, 1386, 188 L. Ed. 2d 392 (2014).

2. The State's Standing Arguments Go to the Merits

The State advances three grounds challenging the Landowners' "standing": (1) Landowners did not own the land when the taking occurred and obtained no assignment; (2) existing mineral leases prevented the Landowners from developing minerals themselves; and (3) Huber acquired ownership through adverse possession, leaving Landowners with no compensable interest.

Several appellate decisions have characterized similar temporal ownership challenges as "standing" questions, *viz.*:

- *Senn v. Texaco, Inc.*, 55 S.W.3d 222, 226 (Tex. App.—Eastland 2001, pet. denied) (holding property owners "lack standing to bring suit for any type of injuries to the land that occurred prior to their purchase")

- *Exxon Corp. v. Pluff*, 94 S.W.3d 22, 27 (Tex. App.—Tyler 2002, pet. denied) (holding plaintiff "lacked standing because he did not own the property at the time the injury occurred")

- *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 732 (Tex. App.—Texarkana 2003, no pet.) (holding that "absent an assignment, a mere subsequent purchaser lacks standing")

- *Cook v. Exxon Corp.*, 145 S.W.3d 776, 781 (Tex. App.—Texarkana 2004, no pet.) (holding "subsequent purchaser lacks standing to recover for pre-purchase injury")

- *Allodial Ltd. P'ship v. N. Tex. Tollway Auth.*, 176 S.W.3d 680, 683 (Tex. App.—Dallas 2005, pet. denied) (plaintiff-landowner lacked "standing" without assignment of claims for pre-purchase land injury)

- *Capps v. City of Bryan*, 685 S.W.3d 165, 169 (Tex. App.—Waco 2024, no pet.), which described temporal ownership as a constitutional standing issue relevant to subject matter jurisdiction.

However, a closer examination reveals none of them treated a lack of standing as affecting the court's subject matter jurisdiction. These courts all reached merits determinations, awarding take-nothing judgments rather than jurisdictional dismissals. Had they truly found a lack of constitutional standing, they would have been compelled to dismiss without addressing the merits.

Recent decisions from the Texas Supreme Court confirm that temporal ownership challenges like the ones the State brings constitute prudential considerations, not constitutional standing issues. In *McLane Champions*, the seller of the Houston Astros argued the buyer lacked "standing" to sue for fraud and breach of contract because it had

7

assigned all its rights under the purchase agreement to a wholly-owned subsidiary. 671 S.W.3d at 912. The Texas Supreme Court rejected the argument, holding that such "extra-constitutional restrictions on the right of a particular plaintiff to bring a particular lawsuit" do not implicate jurisdictional standing. *Id.* at 913 (cleaned up).

The court explained that while "the assignment may (or may not) affect [buyer's] ability to recover damages," it "does not affect [buyer's] constitutional standing and thus does not call into question the court's subject matter jurisdiction." *Id.* Importantly, the court emphasized that "a plaintiff does not lack standing simply because some other legal principle may prevent it from prevailing on the merits." *Id.* (*quoting Data Foundry, Inc. v. City of Austin*, 620 S.W.3d 692, 696 (Tex. 2021)). Here, the Landowners satisfy constitutional standing by alleging concrete injuries to claimed property interests, traceable to the State's conduct, with likelihood of redress through favorable judgment.

*Texas Medical Resources* reaches a similar conclusion. There, out-of-network physicians sued health insurers for failing to pay usual and customary rates for emergency care. 659 S.W.3d at 427. The defendant insurers broadly challenged the plaintiff physicians' ability to bring claims at law, arguing the physicians could not bring direct statutory claims under the Insurance Code, could not satisfy the elements of quantum meruit, and could not bring unfair settlement practices claims. *Id.* at 441.

Like the State's challenges here, the insurers' arguments focused on whether particular plaintiffs had the legal authority to assert these claims under various legal theories. The Supreme Court unanimously treated all of defendants' challenges as merits questions rather than jurisdictional standing issues, noting that the various legal theories the physicians advanced "may fail on the merits, but it does not implicate the doctors'

8

standing to pursue the claim." *Id.*[11]

The State's challenges exemplify prudential considerations, not constitutional standing questions because they involve "the general prohibition on a litigant's raising another person's legal rights" without proper assignment or authority. *Lexmark*, 572 U.S. at 126. What they call "standing" actually represents substantive limitations on Landowners' legal capacity, not constitutional prerequisites to suit. Its arguments about assignment, prior ownership, or adverse possession present merits questions that do not affect the trial court's or our jurisdiction. *McLane Champions*, 671 S.W.3d at 913; *Tex. Med. Res.*, 659 S.W.3d at 441.

We overrule the State's fifth and sixth issues.

B. Are the Landowners' Claims Time-Barred?

The State also contends the trial court erred in granting the Landowners' motion for partial summary judgment on limitations when the evidence establishes as a matter of law that all takings claims are time-barred. The State raised the issue again in post-judgment motions, arguing that limitations barred Landowners' recovery as a matter of law. We agree with the State.

1. The Applicable Framework

Property owners may seek compensation through inverse condemnation when the

---

[11] Guidance also comes from the Eighth Court of Appeals in *Moore v. W. Bend Energy Partners, LLC*, 2024 Tex. App. LEXIS 9016, at *1 (Tex. App.—El Paso Dec. 27, 2024, pet. filed), where heirs challenged a foreclosure that occurred decades before they inherited the property. The *Moore* court rejected the same temporal ownership theory the State advances here, finding that claims about "the transferability of claims to heirs—whether a particular type of claim survives the claimant's death" involve prudential, not constitutional standing. *Id.* at *13–14.

government takes their property without providing adequate compensation. *Tex. Dept. of Transp. v. Self*, 690 S.W.3d 12, 25–26 (Tex. 2024). They must prove "(1) an entity with eminent domain power intentionally performed certain acts (2) that resulted in taking, damaging, or destroying the property for, or applying it to, (3) public use." *Id.* at 26.

Texas has no dedicated statute of limitations for inverse condemnation claims. *Grunwald v. City of Castle Hills*, 100 S.W.3d 350, 353–54 (Tex. App.—San Antonio 2002, no pet.); *see also Hallco Tex. Inc. v. McMullen Cnty.*, 221 S.W.3d 50, 74 (Tex. 2007) (Hecht, J., dissenting) ("It is not entirely clear what statute of limitations applies to such claims"). To fill this gap—using the law of adverse possession as an analogy—Texas courts have concluded that inverse condemnation claims are barred upon expiration of a ten-year limitations period. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.026.[12] The rationale: because the Constitution requires compensation before the State may take land, a landowner should have at least as long to seek compensation as an adverse possessor would to obtain title. *See Tarrant Cnty. Water Control & Improv. Dist. v. Reid*, 203 S.W.2d 290, 293 (Tex. Civ. App.—Fort Worth 1947, writ ref'd n.r.e.). The period begins when the physical taking occurs or entry on the land is made. *Lowenberg v. City of Dallas*, 168 S.W.3d 800, 802 (Tex. 2005).

2. Section 16.026's 160-Acre Limitation Applies Individually.

The parties agree that Texas's adverse possession statutes govern takings claims but disagree on which one applies. The State urges the 10-year limitations schedule in

---

[12] *Brazos River Auth. v. City of Graham*, 163 Tex. 167, 354 S.W.2d 99, 110 (1961); *City of Justin v. Rimrock Enters., Inc.*, 466 S.W.3d 269, 279 (Tex. App.—Fort Worth 2015, pet. denied); *Trail Enters. v. City of Houston*, 957 S.W.2d 625, 631 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *Hubler v. City of Corpus Christi*, 564 S.W.2d 816, 823 (Tex. Civ. App.—Corpus Christi 1978, writ ref'd n.r.e.).

Section 16.026. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.026. The Landowners argue the section does not apply because Section 16.026(b) refers to a 160-acre restriction that does not cover the total area encompassed by the Shine Survey. Critically, no Landowner presented summary judgment evidence to the trial court that their individual property interest taken by the State exceeds 160 acres. The dispositive question is whether landowners can aggregate their combined acreage to avoid Section 16.026's ten-year limitations period. We answer that question, "No." Section 16.026(b) does not alter the limitations period; rather, it limits the adverse taking to 160 acres. *See id.* § 16.026(b).

The Landowners instead reason the 25-year limitations period referenced in Section 16.028 sets forth the correct timeframe. Even if landowners could aggregate— which they cannot—they find no refuge in Section 16.028. Its twenty-five-year period pertains to adverse possession by one "who holds the property in good faith and under a deed or other instrument purporting to convey the property that is recorded." *Id.* § 16.028(a).

According to Landowners, the State's possession rests on the Shine Survey. A survey describes boundaries but does not purport to convey property—it makes no attempt to transfer ownership or express conveyancing intent. Texas law distinguishes between conveyancing instruments and mere descriptions. *Cohen v. Tour Partners, Ltd.*, 2017 Tex. App. LEXIS 3820, at *17 (Tex. App.—Houston [1st Dist.] Apr. 27, 2017, no pet.) (mem. op.) ("Because the document unambiguously fails to convey title and fails to identify any interest in the described property that is conveyed to [appellee], as a matter of law, it is not a deed."). The landowners cannot establish the conveyancing instrument Section 16.028 requires.

11

### 3. Plain Language Controls.

While adverse possession statutes govern takings claims only by analogy, the parties' disagreement over Section 16.026's scope makes textual analysis essential. We are guided in discerning what the legislature intended by first looking at the plain language of the statute. *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015). Unambiguous statutory language must be given its plain meaning. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). We presume the Legislature included each word in the statute for a purpose and that words not included were purposefully omitted. *Lippincott*, 462 S.W.3d at 509.

We interpret language within the context of the entire statutory scheme, harmonizing related provisions to discern legislative intent. *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838–39 (Tex. 2018). We "consider the context and framework of the entire statute and meld its words into a cohesive reflection of legislative intent." *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017).

Section 16.026 provides, in relevant part:

> (a) A person must bring suit not later than 10 years after the day the cause of action accrues to recover real property held in peaceable and adverse possession by another who cultivates, uses, or enjoys the property.

> (b) Without a title instrument, peaceable and adverse possession is limited in this section to 160 acres, including improvements, unless the number of acres actually enclosed exceeds 160 [acres]. If the number of enclosed acres exceeds 160 acres, peaceable and adverse possession extends to the real property actually enclosed.

TEX. CIV. PRAC. & REM. CODE ANN. § 16.026. The plain language of Section 16.026(b)

12

forecloses the Landowners' aggregation theory. The statute focuses on "actually enclosed" acres, confirming an individual application of the limitations period. Separate properties owned by different landowners are not "enclosed" as one tract. The Legislature included the enclosure requirement for a reason. *Lippincott*, 462 S.W.3d at 509.

Moreover, we also presume the Legislature intentionally omitted other terms. *Id.* The Landowners' position requires inserting "total" or "aggregate" before calculating the 160-acre limitation. We are not permitted to make such a judicial rewrite. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008) ("We may not judicially amend a statute by adding words that are not implicitly contained in the language of the statute."); *Spradlin v. Jim Walter Homes, Inc.*, 34 S.W.3d 578, 580 (Tex. 2000) (courts "may not rewrite statutes to reach results we might consider more reasonable than those compelled by the text"). Section 16.026's plain language directs only one conclusion: the 160-acre limitation contemplates individual evaluation of single properties, not collective aggregation of acreage.

### 4. Related Statutory Provisions Confirm Individual Application

The Legislature knows how to address multi-party scenarios when it wants to. Section 16.0265, added in 2017, uses identical 160-acre limiting language but applies only when there are "cotenant heirs" with "undivided ownership interests in . . . the same real property."

This language reveals the Landowners' fatal flaw. Engrafting implied aggregation into Section 16.026's 160-acre requirement would render Section 16.0265 internally incoherent—simultaneously allowing aggregation through its 160-acre language while restricting application to those with undivided interests in the same property. We

13

harmonize related statutory provisions, not create conflicts between them. *Rodriguez*, 547 S.W.3d at 838–39.

## 5. Aggregation of Interests Threatens Absurd Results

Our statutory analysis is also guided by the rule to avoid interpretations leading to absurd results. *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011). The Landowners' interpretation creates arbitrary distinctions: If Smith loses 150 acres to a government taking in 1985, he, standing alone, would have until 1995 to pursue a takings claim. However, under the Landowners' proposed reading, Jones, who suffered an identical constitutional injury of the same size, could extend limitations for an extra fifteen years if he can convince Brown (who lost only fifty acres) to join his lawsuit. Under these circumstances, one's limitations period depends not on the nature and time of the injury, but on one's ability to coordinate with other affected parties—a factor wholly unrelated to the taking itself. Such an approach contradicts the statute's purpose of providing clear, predictable periods based on each landowner's actual, particular injury.

## 6. Application to Present Facts

The factual record confirms our legal conclusions on multiple levels. At summary judgment, no individual landowner presented evidence claiming a taking of more than 160 acres. While the later trial record identifies three landowners whose individual interests may exceed 160 acres, this distinction lacks legal significance because there is no evidence that any allegedly taken property beyond 160 acres was "actually enclosed," as Section 16.026 textually requires. Under Section 16.026's application, each Landowner's takings claim was brought well after the ten-year limitations period expired.

14

The parties' dispute over when the taking first occurred does not affect our analysis. Even taking the Landowners' preferred date of January 28, 1982—the date the Shine Survey was submitted—the limitations period expired ten years later, seven years before any landowner filed suit.[13] All claims are time-barred.

The State twice urged as a matter of law that the 10-year statute of limitations bars the Landowners' takings claims: at summary judgment and in a motion for judgment as a matter of law. A motion for judgment is properly urged in a bench trial if the movant is entitled to judgment as a matter of law. *Jolet v. Garcia,* No. 05-97-01461-CV, 2000 Tex. App. LEXIS 1680, at *4–5 (Tex. App.—Dallas Mar. 15, 2000, pet. denied) (mem. op.). The movant seeking judgment as a matter of law must demonstrate: (1) a specified defect in the nonmovant's pleading makes it insufficient to support a judgment; (2) the evidence conclusively establishes the right of the movant to judgment or negates the right of the nonmovant; or (3) the evidence is insufficient to raise a fact issue that must be established before the nonmovant is entitled to judgment. *Id.* (citing *Boswell v. Farm & Home Sav. Ass'n,* 894 S.W.2d 761, 768 (Tex. App.—Fort Worth 1994, writ denied)).

Because the evidence conclusively establishes that more than ten years elapsed between accrual and filing of each claim, and because no legal doctrine extends or revives the expired limitations period, the trial court erred in failing to render judgment as a matter of law for the State.

---

[13] The Landowners argue class certification tolled limitations, but they concede class certification wasn't sought until "19 years and 5 months" after the alleged taking. Class certification tolling protects pending claims; it cannot resurrect dead ones.

## CONCLUSION

This dispute spans decades, but the legal principles governing it are well-established.  Property owners may seek compensation when the government takes their land, but they must do so within the time limits the law provides.  Those limits exist not to deny justice, but to ensure that claims are brought while evidence remains fresh and witnesses available.

Like the Canadian River itself, time flows in one direction.  The Landowners had ten years to seek compensation for the alleged taking.  They waited decades.  Neither their understandable desire for compensation nor the complexity of riverbed boundary determinations can extend limitations periods that have already expired.

We therefore sustain the State's limitations issue, reverse the trial court's judgment, and render judgment that the Landowners take nothing.  The Landowners' cross-appeal is dismissed as moot.

Lawrence M. Doss
Justice

16